Argued May 13, affirmed September 25, 1928.

# WILLIAM ARCHER, Administrator, v. G. W. GAGE et al.

(270 Pac. 521.)

534

For appellant there was a brief over the names of *Mr. T. T. Bennett, Mr. B. Swanton* and *Mr. William E. Coleman,* with an oral argument by *Mr. Bennett.*

For respondents there was a brief over the names of *Mr. John D. Goss, Mr. M. W. Skipworth* and *Mr. Herbert Murphy,* with oral arguments by *Mr. Goss* and *Mr. Skipworth.*

McBRIDE, J.—It is a more difficult task to convey on paper an adequate idea of the scene of the accident than it is to comprehend it from a map. In the present instance the map introduced is somewhat confusing for the reason that it is drawn in defiance of the usual custom with the top south which inverts all the directions and makes it difficult to follow the evidence though a jury of the vicinage naturally familiar with Marshfield and its suburbs would have no difficulty in following the testimony. On the evening of the eighth day of March the mother of deceased, whose residence was about a block and a half east or southeast of a street called Newport Avenue which at this point runs east and west, was preparing to visit friends residing somewhere north of Newport Avenue. She was not called as a witness, but it seems to be conceded in the argument that her contemplated route and the one taken by her would be through an

alley running southerly from the vicinity of her residence and west of the residence of Mr. Hennesy and debouching on the north side of Newport Avenue at a point nearly opposite but a little south of the west end of the turn-around mentioned in the pleadings which west end is on the south side of the paved portion of Newport Avenue. There is a front porch leading from the vicinity of the Archer property to the turn-around which strikes the turntable fifty feet southeast from the west end thereof. The path is wholly on private property and the turn-around at the point of the intersection is also upon private property. There is no regular street intersection at any point where the turn-around is located, although it appears from the testimony that people frequently use the turn-around as a walk from one side of the street to the other, but there is no evidence of its being so used in the night-time.

The evidence discloses that this place was a crude little hamlet sparsely populated and it seems probable that people crossed the streets wherever it was convenient without regard to technical street intersections as is not an uncommon practice in small villages. The prevalence of such a custom by no means dispenses with the duty of an automobile driver to observe proper precautions while driving upon the streets of such villages, but on the contrary perhaps emphasizes it.

In the case at bar, we have these basic and practically undisputed facts: A dark, misty night, a wet pavement, a heavy machine, which, so far as the testimony discloses, was lawfully equipped with lights sufficient to disclose the presence of any object upon that portion of the street including the turn-around.

It is practically conceded by defendant Chaney in

his testimony that, if the child had been on the turn-around at the time he approached it to make the turn, the light conditions were such that he could have seen him. He says that he did not see him, and from this premise, he argues that the child was not there and therefore that he must have come suddenly upon the turn-around at such a short distance in front of the machine that it was too late to avoid the accident. Chaney, in effect says, "I was driving carefully about 5 or 6 miles an hour. I was keeping a careful look out. If the child had been on the turn-around, I would have seen him. Therefore, it follows that he was not there and must have stepped suddenly upon the turn-around too late for me to have avoided the accident."

Mr. Lucas, a passenger, who was sitting in front near the windshield was not keeping any particular watch ahead until the car had entered the turn when he looked up and saw the child standing on the edge of the turn-around and about four feet ahead of the machine apparently about fifteen feet southeast of the most westerly side of the entrance to the turn-around, and that he was standing upon the most westerly edge of the turn-around and facing the front of the vehicle.

Another witness testified that he was about fifty feet from where the accident occurred; that he saw the bus when it was about one hundred feet from the turn-around; that it was going fast, probably about thirty miles an hour; that at the same time he saw the child running down the hill toward the turn-around and felt in his own mind that he would be hit if the vehicle turned in; that the child slowed down to a walk when he reached the turn-around, which witness claimed was at a point twenty-five or thirty

feet from where he was hit and began to walk slowly down the turn-around toward the place where the accident occurred; that the vehicle slowed down to about fifteen miles an hour as it entered the turn-around and hit the child at about sixteen feet from the westerly end of the turn-around carrying or knocking him along the turn-around about five feet from where it struck him. There was strong testimony tending to show that the witness had previously stated that the child had run directly in front of the bus. Whether this impeaching testimony destroyed the value of his testimony was of course a matter for the jury.

We have given above an abbreviated sketch of a portion of the evidence so as to furnish a background against which to view the rulings of the court respecting the admission of other evidence against the objection of plaintiff and the action of the court in respect to the giving or refusing of certain instructions.

We will first consider the objections made by plaintiff to the action of the court in excluding testimony offered by him. On direct examination Chaney, the driver of the car, testified as follows:

"Q. With reference to the condition of the road and the way it was that night, the condition of the turn-around, state whether or not you could turn this car in there with any fast rate of speed? A. No, sir, I could not under any condition of the road on account of the car.

"Q. What is the tendency of that car in making that short turn? A. It turns hard and is top heavy.

"Q. Do you say that you could not go any faster than the car was going that night? A. Yes, sir.

"Q. You turned that car in on the turn-around as fast as that car could go, did you? A. As fast as the car could go to take the turn safely.

"Q. Did you turn that car in on the turn-around that night as fast as you could drive in with safety? A. Yes, sir.

"Q. You tell this jury you cannot drive in on that turn-around at a greater speed than five miles an hour? A. I mean and follow the pavement."

In rebuttal, plaintiff called R. L. Richardson, a brother-in-law of deceased, who testified that he had driven automobiles for two or three years; that he was acquainted with the machine which ran over deceased; that he was familiar with the turn-around; that he had seen Mr. Chaney drive over it "lots of times." The question was then asked, "at a speed of 15 miles an hour"? This question was objected to and the objection sustained, whereupon, counsel for plaintiff made the following offer:

"We offer to show by this witness that he had repeatedly seen Mr. Chaney drive that automobile on to that turn-around at a rate of speed of more than 15 miles an hour."

■ The offer was rejected. It is not clear upon what theory this testimony was excluded. If upon the theory that the witness was not sufficiently experienced with automobiles to be able to judge the speed at which they were being driven, it may be answered that the general rule is that technical knowledge on that subject is not usually required so long as the observer is shown to have some knowledge. Huddy on Automobiles (8 ed.), states the rule as follows:

"Sec. 1277. Proof of speed of vehicle—qualification of witnesses. As is stated above, it does not require an expert witness to give an opinion as to the speed of an observed motor vehicle. One who has timed automobiles is clearly a competent witness. One who has frequently observed the passage of au-

tomobiles and other vehicles, and ridden in them, and made observations of their rate of speed, may give his opinion of the speed of the car at the time of the collision. One who has driven motor vehicles for a considerable period is qualified to express his opinion on the subject. An occupant of a vehicle toward which an automobile is approaching, may ordinarily testify as to the speed of the machine. And one who has been in the habit of meeting automobiles on the road for years, and has been driving horses all his life, and has ridden on railroad trains and observed the rate at which ordinary vehicles traveled, may give his opinion on the subject. And one who has had an experience of twelve years as a motorman upon a street car is competent to state his opinion as to the rate of speed at which an automobile was traveling. An adult of ordinary intelligence and experience is presumably capable without proof of further qualification, of expressing his opinion as to the speed of a passing automobile which he observes. Even a child of the age of thirteen, or fourteen, years may be qualified to give his opinion. Even the plaintiff who is struck by the machine has been allowed to express his opinion. Additional requirements of sound mind and judgment have been suggested. He should have some knowledge of time and distance in order to give a correct estimate of the number of miles per hour a vehicle is traveling. But the evidence of a witness giving an estimate of speed will not necessarily be stricken out, because he is unable to state the number of feet or rods in a mile.'' See notes in this section.

■ There was, however, an insuperable objection to this testimony and it is this,—the whole tenor of Chaney's testimony has reference to conditions similar to those existing on the evening of the accident, that is, a dark misty evening, a wet pavement, *et cetera*. It might be, that in broad daylight on a dry pavement a car could be driven at a speed of fifteen miles an hour with perfect safety to the driver,

passengers and persons on the street, while conditions such as existed on the evening in question would render driving at the same speed unsafe. The meaning of the witness Chaney's testimony, which seems clear enough from the beginning, is freed from all doubt in his statement on redirect examination in which he says in substance "I drove as fast as I could safely, the planks were wet and I never take any chances on a place like that; the turn is too sharp to drive fast, but I drive as fast as I could with safety."

To have rendered the offer of testimony admissible, it should have included conditions at least similar to those existing on the night of the accident. There was no error committed in excluding the testimony. The value of such testimony in any event was as to this case merely of an impeaching character, as testimony, that a party has driven at a certain rate of speed on one or several occasions, would have little effect that he was driving at the same rate of speed on an occasion where his speed was a subject of judicial inquiry. If the very able counsel who offered this testimony had considered it substantive testimony tending to establish his case, he would have offered it on his direct case. His failure to do so indicates that he took the same view that the writer has above expressed, that its only value was incidentally to impeach Chaney, and, viewed in that light, it was only fair that its introduction should be subject to the limitations above indicated.

The second objection is to the ruling of the court and relates to the exclusion of testimony of William Archer on rebuttal concerning a hole in the turnaround on the northeasterly side thereof about 12 feet from a most westerly end thereof. Counsel asked

defendant Chaney on cross-examination if he had ever seen the hole and Chaney answered that he had and had not considered it of sufficient size or importance to give it particular attention; that it was only about four inches wide and that he had never considered it an obstacle so far as driving was concerned. Counsel then recalled Archer and offered to prove by him that he had measured the hole forty-eight hours after the accident and that it was four and one-half inches wide, sixteen inches long and fourteen inches deep, which offer was rejected by the court. The theory of plaintiff is that the hole constituted such a menace as to draw Chaney's attention from the duty of looking out for the presence of persons on the turn-around. In other words, Chaney was intent upon avoiding the hole and the mud on the east side of the turn-around and that, together with his defective lights, caused him not to see the child who was standing on the west planks of the turn-around when clearly he ought to have seen him.

There are several flaws in this position; first, counsel asked the jury to infer that Chaney considered the hole a menace and was devoting all his attention to avoiding it; second, that in so doing, he neglected to look ahead of him on the other side of the turn-around; third, that if he had so looked, he would have seen deceased in time to have avoided the accident, all of which would be basing a series of inferences upon each other beyond any limit permitted by law.

■ Again, if we concede, for the purpose of discussion, that the presence of the hole and the possibility that Chaney's attention was so diverted by looking out to avoid it he failed to look ahead to

avoid persons on the track, was competent evidence in regard to the probable degree of care he was exercising, such evidence should have been a part of plaintiff's direct case and could not háve been lugged in as rebuttal; at least, the decision on that matter would have been within the discretion of the court. There was no reversible error in its exclusion while there would have been a serious question as to its admissibility had plaintiff received a verdict.

The next exception is to the refusal of the court to admit a photograph (plaintiff's exhibit "E") in evidence. The photograph represented the bus standing in the street and plaintiff's witness failed to identify it as the bus that occasioned the injury but said it looked like one of Gage and Chaney's busses. The court sustained an objection to the introduction and the witness was then asked whether it correctly represented the locality in front of his house on the date of the accident. The question was objected to and the objection sustained. There was no further or any offer of proof on the part of plaintiff.

■ On cross-examination of defendant Chaney, exhibit "E" was shown to him and he was asked if it was a photograph of the car that occasioned the injury, and he answered that it was, but not a correct one, that the front end was distorted and out of proportion to the car. The court excluded the photograph. Another photograph (exhibit "F") was admitted, which Chaney testified was a correct photograph of the car which struck deceased. The jury also viewed the car which did the injury. There was no error in excluding exhibit "E." The jury had everything in relation to the car that it could possibly have shown. This concludes the discussion

as to the rulings of the court on matters of testimony and we will now consider the objections relating to the instructions given or refused. The first exception is to the following instruction which is as follows:

"If you find that Samuel Jerome Archer, without fault or negligence of the defendant, suddenly and unexpectedly appeared on the 'turn-around' immediately in front of the car, I instruct you that his death was an unavoidable accident, and that the rate of speed would be immaterial, for upon such an appearance upon the 'turn-around,' no precaution could have prevented the accident."

This instruction may be fairly considered in connection with the instruction also excepted to which immediately follows:

"The defendants cannot fairly or reasonably be charged with negligence in failing to stop their automobile and avoid the accident, unless it appears that the boy entered upon the 'turn-around' at a sufficient distance from the automobile to permit of its being stopped before the collision occurred. If the boy suddenly moved into or upon the 'turn-around' at a place where the driver had no reason to expect him to do so, and ran directly in front of or against the automobile, the result could hardly have been other than disastrous, even though the machine had been moving at a very slow rate."

■ These two instructions, taken together, fairly present defendants' theory as to how the accident occurred. Chaney's testimony was to the effect that he was keeping a good outlook ahead and that deceased was not observed by him upon the track until the accident happened; that if deceased had been upon the track earlier he would have seen him. It would follow as a natural result, if this testimony were true, that the appearance of the deceased upon

the track was sudden and too late to arrest the progress of the car. This testimony may have impressed the jury with its truth. All of the alleged eye-witnesses to the occurrence seem to concur as to the fact that the turn-around was lighted to the extent that they were able to see what was going on on the turn-around. Chaney says that he had no difficulty in seeing what transpired. Lucas says that when he looked up he saw the child four feet in front of the car, and Coon says that he clearly saw the child when he came upon the track. He only differs from Chaney as to the time and place of the child's appearance and the speed of the car. The jury had a right to believe Chaney and to distrust Coon, or the reverse. The theories of the plaintiff founded on Coon's testimony and of the defendants founded on Chaney's testimony had behind them evidence, which entitled the parties litigant to have them submitted to the jury, who were the final judges as to which was entitled to credence. There was no error in either of the instructions quoted. The next instruction excepted to is as follows:

"I instruct you that if you find from the evidence that the headlights on defendants' car lighted up the space from where said car turned onto said 'turn-around' to and beyond the point at which Samuel Jerome Archer moved into or upon said 'turn-around' so that a substantial object in said space was clearly discernible from said car that that was all that would be appropriate or required under the circumstances, and a failure of said lights to render clearly discernible on a level highway any substantial object two hundred (200) feet directly ahead, and any substantial object one hundred (100) feet ahead, and seven (7) feet to the right of the axis of such vehicle, if any such failure you find, would

not warrant an inference of failure of duty and an inference of failure of duty in that respect could not reasonably be drawn.''

■ This instruction seems to us to be in accordance with the law. Defendants would not be liable in damages for failure to observe some requirement of the law in respect to lights unless such failure contributed to the injury and this is the gist of this instruction. In addition it may be observed that there is no evidence that any requirement of the law was omitted. As the case stands the court had a right to say, as it did in a subsequent instruction, that there was no evidence that the car was defective in equipment in any particular required by law. This also disposes of the next exception urged.

Another exception is to the refusal of the court to give the following instruction:

''In this connection, I instruct you that the fact that the driver of the motor vehicle does not see a pedestrian or person on the 'turn-around,' or did not know of his presence, would in no manner relieve him from his duty of sounding a warning of his intended turn and approach.''

■ This instruction assumes that it is the *duty* of a driver of a motor vehicle to sound a warning of his intended turn. No such duty is required by law. These are circumstances where it might be the duty of the driver to do so, but not invariably. No driver, either in the city or country, is expected to sound his horn at every turn. In the country, especially at blind intersections it may be a necessary and proper precaution. In cities or towns, where there is considerable travel, the accompanying noise might be intolerable.

There were three requests following this, which are as follows:

"Plaintiff contends that Samuel Jerome Archer, shortly before being struck and run over by the automobile of the defendants, was walking northerly, or northwesterly along the 'turn-around' or was standing waiting for the motor vehicle to pass along the concrete paving, and that the view of said child for more than twenty feet, and in fact for a considerable distance in addition thereto, was clear and unobstructed, and that said child was visible and that it was the duty of the driver of said motor vehicle before turning on to the 'turn-around,' and after driving on it, to observe the presence of said child and avoid him, and in this connection, gentlemen of the jury, I instruct you that if you find said child was upon said 'turn-around' prior to the approach to the 'turn-around' of the motor vehicle of defendants, and he was walking along the same in a northerly or northwesterly direction, or was standing upon the same I instruct you that it was the duty of the defendant Chaney, in operating said vehicle to observe the presence of said child and to stop his motor vehicle, or to avoid him; and I instruct you in this connection that the failure of the defendant, Chaney, to observe the presence of said child, would constitute negligence on the part of the defendant Chaney.

"And I further instruct you in this connection that if you find the circumstances above specified to be true by a preponderance of the evidence, then that it was the duty of the defendant Chaney to so operate said motor vehicle as to avoid said child, or to stop said motor vehicle before striking him.

"It is contended by plaintiff in this case that Samuel Jerome Archer was in a public street and was crossing the street from the south side thereof to the north, and that his line of travel was along the west plank of the 'turn-around' to the concrete paving, and thence directly north to the north side of the street known as Newport Avenue, and I instruct

you gentlemen of the jury that if you find that this was his proposed line of travel and was customarily used by pedestrians as a street crossing, then I instruct you that as a matter of law, a pedestrian having first acquired the crossing; it was the duty of the approaching automobile to yield to Samuel Jerome Archer and not to attempt to cross his line of travel.''

So far as said requests are applicable, they seem to us to have been covered by the general instructions from which we shall hereafter quote.

■ The last exception is to the refusal of the court to give the following requested instruction, which is as follows:

''Gentlemen of the jury, I instruct you that Samuel Jerome Archer in traveling along the 'turn-around' at the place where the injury occurred, was rightfully on the left hand side of the 'turn-around' and that as between the child's use of the 'turn-around' to travel in a westerly or northwesterly direction and to use either the right or left hand side of the 'turn-around' he was rightfully in the use of the left hand side of the highway as he could there best observe the approach of vehicles which he had to pass or meet and would be in a less exposed position to a vehicle traveling on to the 'turn-around' from the west.''

The turn-around, as a whole, was not a highway, but, that portion of it where the injury occurred was a portion of the street and the deceased had a right to walk upon it just as he had a right to travel on any other part. The planks which constituted its structure no doubt afforded a welcome change from the muddy and wet condition of other parts of the street and it was not unlawful for him to use it for that purpose. He was not bound or required to walk on any particular side of it as is required by law in the case of public highways. A grown man with all

his faculties has, unless prohibited by ordinance, a
technical legal right to cross a street or road any-
where, whether he is negligent in so doing is another
question. One may exercise a legal right in such a
careless manner as to preclude himself from recov-
ering damages resulting from his exercising a legal
right negligently. But here there is no question as
to the legal right of deceased to be in the turn-around.
He was only four and one-half years old, almost a
baby, and whether he was on the turn-around lawfully
or otherwise, makes no difference. As the court told
the jury, he was not and could not be a trespasser.
Whether he was on the right or left hand side of the
turn-around could not alter or detract from or add to
the duty of the defendant to keep a vigilant outlook
to see whether or not there was anyone on the street
or turn-around in the direction that he was going.
Whether he was rightfully on the track or otherwise
could make no difference in this case. It was the
duty of the driver of the car to keep a vigilant out-
look ahead and the court told them this in plain lan-
guage. The request was not necessary and its lan-
guage might have been understood by some jurors to
express some feeling on the part of the court as to
how the case should be decided. The respective
rights of a pedestrian and a driver of an automobile
are covered, so far as they relate to this case, by the
general charge, extracts from which we quote as fol-
lows:

"The plaintiff contends that the defendants care-
lessly and negligently operated said motor vehicle
along the highway and on to the turn-around at a
high, dangerous and unlawful rate of speed that en-
dangered the life of the child, and I instruct you that
it is the duty of the driver of a motor vehicle to at

no time operate his vehicle at a rate of speed which would endanger the life or safety of any person. The law permits the operator of a motor vehicle to operate such vehicles at certain times at a rate of speed of thirty miles per hour on the public highways of the state, but you are instructed that the law does not give to the operator of a motor vehicle the right to operate such vehicle at such a rate of speed at all times, but on the contrary, in case of approaching a dangerous turn, or conditions of the road or highway where pedestrians are apt to be, that it is the duty of the driver of a motor vehicle to operate said vehicle at such a rate of speed that will not endanger the life or limb of any person. I instruct you that you are the judges of the rate of speed which was or was not unreasonable, taking into consideration the roadway about to be traveled, the darkness of the evening, the conditions of the light, and generally the circumstances surrounding the situation. If you find from the evidence that the defendant in operating the motor vehicle off of the highway on the turn-around, taking into consideration all of the circumstances, operated the motor vehicle at a rate of speed that was greater than was reasonable under all the circumstances, then I instruct you that this would constitute negligence on the part of the defendant in case you further find it was the proximate cause of the injury of the said child for which the defendant would be responsible.

"The plaintiff contends that the defendant was negligent in that he failed to keep a lookout on the highway and to observe and know the presence of said child. I instruct you that it is the duty of the operator of a motor vehicle to at all times keep a lookout in front and to the sides of the motor vehicle which he is driving, so that he can ascertain and know the presence of any substantial object in the anticipated pathway of the motor vehicle. I instruct you that if the defendant in this case failed to keep a vigilant and watchful lookout so as to at all times ascertain the presence of a substantial object in the

line of travel of the motor vehicle which he was operating, and that such failure was the proximate cause of the injury to the said child, this would constitute negligence for which the defendant would be responsible.

"The plaintiff contends that the defendant was negligent in that he failed to keep said automobile under control while driving on said turn-around and negligently collided with the said child and operated the vehicle on to and over said child. I further instruct you that a child is a substantial object, and if you find from the evidence that the child was standing on the turn-around or walking on the turn-around, I instruct you that it was the duty of the defendant to have so operated the motor vehicle off the customary line of travel on the highway on to the turn-around in such a manner that the same was at all times under the control of the driver, and in such a manner that he could have observed the presence of said child and avoided him; and that a failure to observe the presence of said child and avoid him, in case you find that such child was standing or walking upon the turn-around immediately before he was struck by the motor vehicle of the defendant, would constitute negligence for which the defendants would be responsible.

"The court takes judicial notice of the hour of sunset, and I instruct you that on the 8th day of March, 1924, it was sunset on Coos Bay at 5:58 P. M. of that day.

"The plaintiff contends that the defendants were negligent in that they equipped and operated the motor vehicle which struck and ran over the said child killing him with an iron baggage holder protruding some two feet in front of said car, containing keen sharp points and hard iron sides and in that they failed to equip said vehicle with a bumper or fender protruding in front of said baggage holder. You are to determine gentlemen of the jury from all the facts and circumstances, the way the automobile was operated, the purpose for which it was used and

intending to be used, as to whether or not a reasonably cautious prudent man would, under all of the circumstances, have equipped and operated a motor vehicle on the public streets and highways as this motor vehicle is alleged to have been equipped and operated; and if you find that a man of ordinary care and prudence would not have operated a motor vehicle so equipped with the iron baggage holder protruding in front of the car and unprotected by a bumper, and if you find such baggage holder on said car was the proximate cause of the injury complained of, then I instruct you that this would constitute negligence on the part of the defendants, and they would be responsible for any injury proximately resulting from such negligence.

"There are allegations in the complaint which I have read to you, that the defendants were grossly negligent in certain particulars with reference to the operation of the motor vehicle, and in this connection you are advised that the words 'gross negligence' mean the want of even slight care.

"It is the duty of the operator of a motor vehicle to at all times observe the anticipated lines of travel of the motor vehicle which he is operating, in case you find from the evidence in this case the defendant was operating the motor vehicle which he was driving on to the turn-around in such a manner that he failed to watch his proposed line of travel and observe and know of any substantial object, such as a child in the proposed line of travel of the vehicle, his failure so to do would constitute gross negligence for which the defendants would be responsible.

"It is contended in this case that Samuel Jerome Archer the child in question was contributorily negligent. I instruct you that a child of the age of Samuel Jerome Archer is not required or expected to exercise the degree of care or precaution which would be expected from an adult, and by reason of his age, as a matter of law could not be guilty of contributory negligence, and you are to wholly disregard any allegations or testimony in any manner tending to es-

tablish any negligence of any kind on the part of said child, Samuel Jerome Archer."

It is impossible to read the excerpts from the charge above given as well as that part omitted from consideration of brevity without being impressed with the fairness and impartiality of the trial. It was a case appealing to the sympathies of the court and jury and those of every man who has a true man's heart in his bosom.

In spite of this natural sympathy, the fact that the jury returned a verdict for the defendants indicates that their face-to-face experience with the witnesses impressed them strongly with the truth of defendant's contention, that the death of this bright, promising child was the result of an unavoidable accident.

The judgment is affirmed. AFFIRMED.

RAND, C. J., and ROSSMAN and COSHOW, JJ., concur.